IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| LARRY BODFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | 4:10CV3097 |
| | ) | |
| v. | ) | |
| | ) | |
| AG VALLEY COOPERATIVE, | ) | **MEMORANDUM** |
| NON-STOCK, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |
| | ) | |

After experiencing economic difficulties during the fall of 2008 and spring of 2009, defendant Ag Valley Cooperative ("Ag Valley") implemented numerous cost-saving measures in August 2009, including a reduction-in-force ("RIF") that resulted in the elimination of several positions, including plaintiff Larry Bodfield's job as a dry-fertilizer delivery driver at Ag Valley's agronomy facility in Arapahoe, Nebraska. When Ag Valley implemented the RIF, Plaintiff was on leave pursuant to the Family Medical Leave Act ("FMLA"). Plaintiff subsequently filed this lawsuit, alleging that Ag Valley terminated his employment in retaliation for taking FMLA leave. Now pending before the court is Defendant's motion for summary judgment (filing 14).

### *Undisputed Facts*[1]

1.     Ag Valley is a diversified agricultural cooperative business organization serving customers from five primary divisions: (1) Grain; (2) Agronomy; (3) Petroleum; (4) Water Resource; and (5) Feed. (Filing 16-1, Aff. Ron Hunter ("Hunter Aff.") ¶ 3.)

2.     Ag Valley's Grain Division buys, sells, handles, and markets farm commodities produced by area farmers.   The Agronomy Division provides soil-nutrient inputs of anhydrous ammonia, other dry and liquid fertilizer, herbicide, and pest-control chemicals.   The Petroleum Division provides energy products of gasoline, diesel fuel, oils, hydraulic fluids, grease, and propane to area farmers, ranchers, and community residents.   The Water Resource Division provides sub-surface drip-irrigation systems for Ag Valley customers.   The Feed Division provides animal nutrition products to small, medium, and large livestock operations through sales of premix, concentrate, and custom mix and blend feeds. (Filing 16-1, Hunter Aff. ¶¶ 4-8.)

3.     Ag Valley ownership is comprised of area farmers and patrons who purchase a membership or earn their membership through business done and profits

---

[1]Relying on the materials submitted by Defendant, Plaintiff's counsel purports to dispute some of the facts appearing in Defendant's statement of undisputed material facts.  Suffice it to state that Plaintiff has failed to establish a genuine issue of material fact as to Defendant's stated facts for these reasons, among others: (1) evidence Plaintiff cites has not been filed (Filing 22 at CM/ECF p. 3 ¶ 10 (citing pages 9:8-25 of Bodfield Dep.)); (2) Plaintiff cites no evidence to support the alleged factual dispute (*id.* at CM/ECF p. 7 ¶ 38); (3) Plaintiff's repeated references to the incompleteness of a July 2009 power-point presentation do not create genuine issues of material fact established by Defendant (*id.* at CM/ECF pp. 4, 5, 7, 9); and (4) Plaintiff has filed no evidence, affidavits, or deposition testimony contradicting the materials submitted in support of Ag Valley's motion for summary judgment.

acquired from the cooperative.  (Filing 16-1, Hunter Aff. ¶ 9.)

4.      Ag Valley has seven facilities in its Agronomy Division, all of which haul and distribute liquid fertilizer, and five of which haul and distribute dry fertilizer. (Filing 16-1, Hunter Aff. ¶¶ 10-12; Filing 16-2, Dep. Larry Bodfield ("Bodfield Dep.") 75:23-76:5.)  Eighty percent (80%) of the fertilizer Ag Valley sells to its customers is liquid fertilizer, and 20% is dry fertilizer.  (Filing 16-2, Bodfield Dep. 74:25-75:8; Filing 16-1, Hunter Aff. ¶ 13.)

5.      Plaintiff began his full-time employment with Ag Valley on May 16, 2005, as a truck driver in the Agronomy Division hauling grain out of Ag Valley's facility in Edison, Nebraska.  (Filing 16-3, Aff. Kevin Nielsen ("Nielsen Aff.") ¶ 3; Bodfield Dep. 53:15-22.)  After approximately one year, Bodfield was transferred to Ag Valley's Arapahoe, Nebraska, facility, where he began hauling liquid fertilizer. (Filing 16-2, Bodfield Dep. 53:18-54:5.)   After hauling liquid fertilizer for approximately one year, Plaintiff hauled primarily dry fertilizer until his termination in August 2009. (Filing 16-2, Bodfield Dep. 54:3-17, 55:7-56:8; Filing 1, Complaint ¶ 7.)

6.      Plaintiff was the main dry-fertilizer truck driver employed at the Arapahoe facility.   (Filing 16-2, Bodfield Dep. 89:4-7.)  Darius Wendland ("Wendland") was the other full-time truck driver at the Arapahoe facility and was primarily responsible for hauling liquid fertilizer.  (Filing 16-2, Bodfield Dep. 86:11-20.)

7.      Throughout Plaintiff's employment, Ag Valley used truck drivers from other facilities to haul fertilizer for the Arapahoe facility. (Filing 16-2, Bodfield Dep. 87:10-14, 62:24-63:15.)

8.      A typical day at work for Plaintiff as a dry-fertilizer truck driver

3

involved clocking in, receiving orders regarding where to take the fertilizer, starting the truck and making sure it was loaded with dry fertilizer, and then hauling the fertilizer out to the fields where another Ag Valley employee would load the fertilizer from the truck into a spreader machine and spread the fertilizer onto the fields.  As soon as the truck was out of fertilizer, Plaintiff would return to town to get another load, and the process would repeat itself throughout the day.  (Filing 16-2, Bodfield Dep. 57:4-58:14.)

9.     In November 2005, Plaintiff was off work for an extended period of time as a result of a medical condition.  (Filing 16-2, Bodfield Dep. 92:4-94:4, 95:8-20.) Ag Valley did not retaliate against Plaintiff in any manner for being off work in 2005 as a result of this medical condition, and Plaintiff's pay and benefits were the same after Plaintiff recovered and returned to work.  (Filing 16-2, Bodfield Dep. 97:2-12.)

10.     Plaintiff was also off work for two weeks or more in August 2006 as a result of a medical condition.  (Filing 16-2, Bodfield Dep. 97:13-98:16.)  Ag Valley did not retaliate against Plaintiff in any manner for being off work in August 2006, and Plaintiff's pay and benefits were the same after Plaintiff fully recovered and returned to work.  (Filing 16-2, Bodfield Dep. 98:23-99:5.)

11.     In 2008, fertilizer prices began rising steadily.  Ag Valley anticipated that fertilizer prices would continue to rise in the future.  Ag Valley made a strategic business decision to purchase enough fertilizer to fill up their recently expanded fertilizer storage capacity in an effort to avoid paying higher prices for fertilizer in the near future.  (Filing 16-1, Hunter Aff. ¶ 14.)

12.     The fertilizer market unexpectedly crashed shortly after Ag Valley had filled their storage facilities.  Following the market crash, the market price of fertilizer was one-half the price Ag Valley paid.  (Filing 16-1, Hunter Aff. ¶ 15.)

4

13.     Ag Valley initially resisted selling their fertilizer at a loss, hoping the market would rebound and fertilizer prices would return to a level close to what it had paid. However, fertilizer prices did not return to their previous levels, and the company made the business decision to sell their fertilizer at a loss in hopes of gaining some revenue from the fertilizer. (Filing 16-1, Hunter Aff. ¶ 16.)

14.     By the time Ag Valley began selling the fertilizer at a loss, almost all of their customers had already purchased the fertilizer they needed from other companies. Accordingly, the demand for fertilizer declined significantly at all of the facilities in Ag Valley's Agronomy Division, including the Arapahoe facility where Plaintiff worked. (Filing 16-1, Hunter Aff. ¶ 17.)

15.     As a result of the decreased fertilizer demand, Ag Valley assigned Plaintiff other duties during the periods of time in which there was no dry fertilizer to haul. Those other duties included: (1) performing minor maintenance and cleaning duties on the fertilizer trucks; (2) providing assistance with seed corn and seed wheat; (3) loading trucks with seed corn and seed wheat; and (4) sweeping the shop. (Filing 16-4, Aff. Darrell Fellows ("Fellows Aff.") ¶ 4; Filing 16-2, Bodfield Dep. 65:22-66:16.)

16.     In 2009, Plaintiff spent less than 50% of his work time delivering fertilizer. (Filing 16-5, Pl.'s Answer to Def.'s First Set of Req. for Admis., Req. No. 6; Filing 16-2, Bodfield Dep. 71:17- 21.)

17.     On December 2, 2008, Plaintiff informed Nielsen that his wife had been diagnosed with cancer, and he requested some time off work to be with her. (Filing 16-2, Bodfield Dep. 99:12-23, 100:4-102:5; Filing 16-6, Letter from Nielsen to Bodfield.)

18.     Nielsen granted Bodfield's request to take time off work and informed

5

Bodfield that he may be eligible for FMLA leave. (Filing 16-2, Bodfield Dep. 102:6-23; Filing 16-6, Letter from Nielsen to Bodfield.) Plaintiff subsequently informed Nielsen that he wanted to take FMLA leave, and he utilized FMLA leave to cover absences from work beginning in December 2008. (Filing 16-2, Bodfield Dep. 102:24-103:15.)

19.     Ag Valley did not retaliate against Plaintiff in any manner for taking FMLA leave in December 2008. (Filing 16-2, Bodfield Dep. 104:3-6.) In fact, Plaintiff received a raise when he returned to work in 2009 after taking FMLA leave. (Filing 16-2, Bodfield Dep. 103:22-104:2; Filing 16-3, Nielsen Aff. ¶ 14.)

20.     During the summer of 2009, Plaintiff requested additional time off work to be with his wife. (Filing 16-2, Bodfield Dep. 104:7-13.)

21.     By June 2009, Plaintiff had exhausted all of his accrued paid sick leave and paid vacation leave for his absences to be with his wife during her illness. (Filing 16-2, Bodfield Dep. 105:20-106:7, 107:18-108:2; Filing 16-5, Pl.'s Answer to Def.'s First Set of Req. for Admis., Req. Nos. 7 & 8.)

22.     Although Plaintiff had exhausted his paid sick leave and paid vacation leave, he informed Hunter that he desired to remain off work to be with his wife, even though he did not have any sources of income and was concerned about his bills. (Filing 16-2, Bodfield Dep. 108:3-110:4; Filing 16-1, Hunter Aff. ¶¶ 20-23.) Plaintiff informed Hunter that his wife was in critical condition, and that spending time with his wife would be very precious. (Filing 16-2, Bodfield Dep. 109:7-16; Filing 16-1, Hunter Aff. ¶ 18.)

23.     Hunter allowed Plaintiff to take continued time off to spend time with his wife. (Filing 16-2, Bodfield Dep. 109:7-16; Filing 16-1, Hunter Aff. ¶ 19.) Further, Hunter agreed to continue paying Plaintiff 40 hours per week although

6

Plaintiff had exhausted all of his paid leave.  (Filing 16-2, Bodfield Dep. 110:4-18; Filing 16-1, Hunter Aff. ¶ 22.)

24.     Plaintiff performed no work during the June 7, 2009, through June 20, 2009, pay period.  (Filing 16-3, Nielsen Aff. ¶ 4; Filing 16-5, Pl.'s Answer to Def.'s First Set of Req. for Admis., Req. No. 11.)  However, Plaintiff received 80 hours of pay on his June 25, 2009, paycheck.  (Filing 16-1, Hunter Aff. ¶¶ 23-24; Filing 16-3, Nielsen Aff. ¶¶ 5-7; Filing 16-2, Bodfield Dep. 110:19-11:8, 225:5-11; Filing 16-7, E-mail from Nielsen to Sides; Filing 16-5, Pl.'s Answer to Def.'s First Set of Req. for Admis., Req. Nos. 12 & 13.)

25.     In addition, Plaintiff was paid 80 hours on his July 9, 2009, paycheck, 32 of which were designated bereavement pay, even though Plaintiff performed no work during the June 21, 2009, through July 4, 2009, pay period.  (Filing 16-3, Nielsen Aff. ¶¶ 8-10; Filing 16-5, Pl.'s Answer to Def.'s First Set of Req. for Admis., Req. No. 10; Filing 16-8, Policy Handbook.)  Of the remaining 48 hours on Plaintiff's July 9, 2009, paycheck, 16 hours were vacation pay, and the other 32 hours were coded as sick leave and gratuitously provided to Plaintiff even though he had exhausted all of the sick leave he had accrued under Ag Valley's policies.  (Filing 16-3, Nielsen Aff. ¶ 11; Filing 16-9, Payroll Report; Filing 16-2, Bodfield Dep. 112:8-113:22; Filing 16-5, Pl.'s Answer to Def.'s First Set of Req. for Admis., Req. No. 10.)

26.     During June and July 2009, Ag Valley provided Plaintiff with over 100 hours of pay that he had not earned, and which he was not entitled to, during the period of time he was off work to be with his wife. Plaintiff was very grateful for Ag Valley's generosity. (Filing 16-2, Bodfield Dep. 110:11-111:11, 225:5-14; Filing 16-3, Nielsen Aff. ¶ 12; Filing 16-9, Payroll Report; Filing 16-5, Pl.'s Answer to Def.'s First Set of Req. for Admis., Req. Nos. 9, 10, 16.)

27.     Plaintiff returned to work on July 13, 2009.  (Filing 16-3, Nielsen Aff. ¶ 13.)

28.     Prior to the market downturn resulting in a drastic reduction in fertilizer prices, Ag Valley projected its 2009 profits to be between $2 million and $4 million. After the market downturn, Ag Valley projected net losses of approximately $9 million.  (Filing 16-1, Hunter Aff. ¶ 26.)

29.     As a result of the market downturn and the massive projected losses, Ag Valley held a strategy meeting in Kearney, Nebraska, on July 20, 2009, to discuss various cost-cutting strategies, including implementing a business-wide reduction-in-force ("RIF").  (Filing 16-1, Hunter Aff. ¶ 27; Filing 16-10, Power Point Presentation p. 8 (July 20, 2009).)

30.     On July 22, 2009, a black widow or brown recluse spider bit Plaintiff while at work.  (Filing 16-2, Bodfield Dep. 111:16-112:2, 114:9-19.)  Plaintiff went to see Dr. Bill Malchow on July 23, 2009, and Dr. Malchow excused Plaintiff from work until July 28, 2009, as a result of the spider bite.  (Filing 16-2, Bodfield Dep. 116:12-17, 119:5-18.)  Plaintiff presented the note from Dr. Malchow to Nielsen on July 23, 2009, and Nielsen provided Plaintiff with the paperwork to request FMLA leave for absences associated with his spider bite.  (Filing 16-2, Bodfield Dep. 119:15-122:7; Filing 16-3, Nielsen Aff. ¶ 15.)

31.     Plaintiff's physician subsequently diagnosed Plaintiff with a medical condition unrelated to the spider bite, and the doctor authorized Plaintiff to remain off work on FMLA leave until a final determination could be made regarding his medical condition.  (Filing 16-11, DOL Certif. of Health Care Provider.)

32.     Plaintiff heard some rumors from fellow employees in the summer of 2009 that Ag Valley was experiencing financial troubles and a large layoff was likely

8

to occur.  (Filing 16-2, Bodfield Dep. 201:5-25.)

33.     Following the July 20, 2009, strategy meeting, Ag Valley implemented numerous cost-cutting measures on August 27, 2009, including: (1) discontinuing daily hot lunch specials at all Ag Valley convenience stores; (2) increasing the concentration on developing additional sales through a cross-lead selling program; (3) increasing the focus on sharing labor between divisions and departments in order to improve efficiency; (4) reducing and/or eliminating overtime hours in some job functions; (5) increasing employee share of health insurance premiums; (6) ceasing company matching contributions to the 401(k) retirement plan; and (7) implementing a RIF.  (Filing 16-1, Hunter Aff. ¶ 28; Filing 16-12, Letter From Ag Valley to Employees.)

34.     All employees, including Plaintiff, were mailed a letter from Ag Valley on August 27, 2009, explaining the changes that Ag Valley was implementing in an effort to increase operational efficiencies and meet the company's financial goals. (Filing 16-1, Hunter Aff. ¶ 29; Filing 16-12, Letter From Ag Valley to Employees; Filing 16-2, Bodfield Dep. 202:4-203:11.)  At the time the RIF was implemented, Ag Valley employed approximately 284 employees across its five divisions.  (Filing 16-1, Hunter Aff. ¶ 31.)

35.     Ag Valley considered the performance and expected profitability of each division when determining the number of employees who would be subject to the RIF in each division.  (Filing 16-1, Hunter Aff. ¶ 32.)  At the time the RIF was implemented, the Agronomy Division was experiencing the most severe financial difficulties due to the abundance of high-priced fertilizer that Ag Valley was unable to sell. (Filing 16-1, Hunter Aff. ¶ 33.)  In addition, after analyzing the staffing levels throughout each of the company's divisions, it was determined that the Agronomy Division was significantly overstaffed in comparison to Ag Valley's other divisions. (Filing 16-1, Hunter Aff. ¶ 34.)

9

36.     Ag Valley determined the RIF would include ten positions company-wide, seven of which were to be from the Agronomy Division, reducing the number of employees in the division from 95 to 88.  (Filing 16-1, Hunter Aff. ¶ 35.)

37.     The objective criteria for determining which positions would be eliminated within each division included: (1) elimination of job function; (2) relative skills, knowledge, and productivity; (3) length of service; and (4) effect on customer service.  (Filing 16-1, Hunter Aff. ¶ 36.)  Agronomy Division Manager Darrell Fellows ("Fellows") determined which Agronomy Division positions would be eliminated in accordance with Ag Valley's selection criteria.  (Filing 16-4, Fellows Aff. ¶¶ 5-6.)

38.     Plaintiff's dry-fertilizer truck-driver position was one of the positions selected for elimination.  (Filing 16-2, Bodfield Dep. 206:1-9; Filing 16-4, Fellows Aff. ¶ 7.)  Ag Valley eliminated Plaintiff's position due to decreased fertilizer demand, resulting in Plaintiff spending less than 50% of his work time delivering dry fertilizer. Ag Valley determined Plaintiff's dry-fertilizer truck-driving duties could easily be allocated among numerous existing employees with truck-driving capabilities without affecting Ag Valley's customer service.  (Filing 16-4, Fellows Aff. ¶¶ 8-9.)

39.     Plaintiff was off work on FMLA leave when Ag Valley implemented the RIF on August 28, 2009.  (Filing 16-3, Nielsen Aff. ¶ 21.)  On that date, Nielsen traveled to Plaintiff's home and personally informed him that his position at Ag Valley had been eliminated pursuant to the RIF.  (Filing 16-2, Bodfield Dep. 203:15-204:5, 206:1-9, 207:8-209:2.)

40.     At some point, Plaintiff received a document explaining that his position had been eliminated pursuant to a RIF.  The document also explained that Plaintiff was entitled to 80 hours of severance pay and his insurance benefits would continue

10

through September 30, 2009.  (Filing 16-3, Nielsen Aff. ¶¶ 19-20; Filing 16-2, Bodfield Dep. 204:25-205:15.)   Plaintiff subsequently received these promised benefits.  (Filing 16-2, Bodfield Dep. 209:21-8.)

41.    Ag Valley did not replace Plaintiff, instead distributing his dry-fertilizer truck-driving duties to existing employees with truck-driving capabilities.  (Filing 16-4, Fellows Aff. ¶¶ 10-12; Filing 16-2, Bodfield Dep. 211:4-10.)  None of the other nine employees whose positions were eliminated pursuant to the RIF were exercising their FMLA rights at the time the RIF was implemented.  (Filing 16-3, Nielsen Aff. ¶ 22.)

42.    No employee or manager at Ag Valley made any negative comments to Plaintiff about taking FMLA leave.  (Filing 16-2, Bodfield Dep. 214:10-13.)

## *Standard of Review*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

"To survive a motion for summary judgment, the nonmoving party must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor based on more than mere speculation, conjecture, or fantasy."  *Putman v. Unity Health System*, 348 F.3d 732, 733-34 (8th Cir. 2003) (internal quotation & alterations omitted).  "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment."  *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007).

Although we view the facts in the light most favorable to the

non-moving party, we do not accept unreasonable inferences or sheer speculation as fact. The moving party bears the burden to demonstrate that there is no issue of material fact. The plaintiff may not then simply point to allegations made in her complaint but must identify and provide evidence of specific facts creating a triable controversy.

*Howard v. Columbia Public School Dist.*, 363 F.3d 797, 800 (8th Cir. 2004) (internal citations & quotations omitted).

### *Plaintiff's FMLA Claims*

Two types of claims exist under the FMLA: (1) 'interference' . . . claims, in which the employee alleges that an employer denied or interfered with his substantive rights under the FMLA and (2) 'retaliation' . . . claims, in which the employee alleges that the employer discriminated against him for exercising his FMLA rights. The difference between the two claims is that the interference claim merely requires proof that the employer denied the employee his entitlements under the FMLA, while the retaliation claim requires proof of retaliatory intent.

*Wisbey v. City of Lincoln*, 612 F.3d 667, 675 (8th Cir. 2010) (quotations omitted). It is not clear from Plaintiff's complaint whether he asserts an "interference" or "retaliation" claim. Accordingly, I shall address both types of claims.

### *A. Interference Claim*

"It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). "The Act's prohibition against 'interference' prohibits an employer from discriminating or retaliating against an employee . . . for having exercised . . . FMLA rights." 29 C.F.R. § 825.220(c). "In an interference claim, an employee must show only that he or she was entitled to the benefit denied." *Wisbey,* 612 F.3d at 675 (quotation omitted). To the extent Plaintiff's complaint is intended

12

to allege an interference claim, I construe Plaintiff's claim to be that Ag Valley interfered with his FMLA rights when his employment was terminated while he was on FMLA leave.

Ag Valley acknowledges that Plaintiff was discharged while on FMLA leave. However, the Eighth Circuit Court of Appeals has clearly stated that "the mere fact of discharge during FMLA leave by no means demands an employer be held strictly liable for violating the FMLA's prohibition of interfering with an employee's FMLA rights." *Throneberry v. McGehee Desha County Hosp.*, 403 F.3d 972, 980 (8th Cir. 2005). Furthermore, "where an employer's reason for dismissal is insufficiently related to FMLA leave, the reason will not support the employee's recovery." *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1051 (8th Cir. 2006).

If an employer can prove that it would have laid off the employee, even if the employee was not on FMLA leave at the time of the layoff, the employee is not entitled to restoration of his job. 29 C.F.R. § 825.216(a).

> If an employee is laid off during the course of taking FMLA leave and employment is terminated, the employer's responsibility to continue FMLA leave, maintain group health plan benefits and restore the employee cease at the time the employee is laid off, provided the employer has no continuing obligations under a collective bargaining agreement or otherwise. An employer would have the burden of proving that an employee would have been laid off during the FMLA leave period and, therefore, would not be entitled to restoration.

29 C.F.R. § 825.216 (a)(1). *See also Throneberry*, 403 F.3d at 977-79 ("The FMLA simply does not force an employer to retain an employee on FMLA leave when the employer would not have retained the employee had the employee not been on FMLA leave. . . . As long as an employer can show a lawful reason, i.e., a reason unrelated to an employee's exercise of FMLA rights, for not restoring an employee on FMLA

leave to [his] position, the employer will be justified to interfere with an employee's FMLA leave rights.").

A plaintiff cannot recover under an interference theory where, as here, Ag Valley discharged him for reasons wholly unrelated to his FMLA leave. Pursuant to *Throneberry*, once Ag Valley proves that Plaintiff would have been laid off during the RIF, even if he had not been off work on FMLA leave, Ag Valley can successfully establish that it had no obligation to re-employ Plaintiff following his leave. Ag Valley meets this burden.

The undisputed evidence establishes that in late 2008 and early 2009, Ag Valley experienced substantial financial losses following a widespread downturn in the nation's economy affecting, among other markets, fertilizer. As a result of this downturn, Ag Valley possessed an extraordinary amount of high-priced fertilizer that it was unable to sell. Ag Valley began evaluating cost-cutting options in an effort to minimize its operating losses. On July 20, 2009, Ag Valley executives held a strategy meeting to discuss options for reducing costs and increasing profitability. Specifically, the executives discussed widespread changes that could be implemented in five different Ag Valley divisions.

Ag Valley ultimately implemented numerous cost-cutting measures, including a RIF to reduce labor costs. While the other cost-cutting measures were implemented company-wide, Ag Valley selected its Agronomy Division (of which Plaintiff was a member) for the bulk of the lay-offs because it was experiencing the most severe financial difficulties. In addition, a company-wide analysis revealed that the Agronomy Division was overstaffed as compared to the other Ag Valley divisions. Ultimately, Ag Valley laid off ten employees on August 28, 2009, seven of which were employed by Ag Valley's Agronomy Division.

Although he was employed as a dry-fertilizer truck driver for Ag Valley,

14

Plaintiff admits that in 2009 he spent less than half of his time actually hauling fertilizer due to the severe decrease in fertilizer demand. As a result, Plaintiff spent the majority of his time completing odd jobs, such as performing minor maintenance duties and sweeping the shop.

Pursuant to its objective criteria for determining which positions would be eliminated, Ag Valley selected Plaintiff's dry-fertilizer truck-driving position for elimination because his diminished truck-driving duties could easily be dispersed among existing employees with little or no effect on Ag Valley's customer service. Ag Valley has not hired anyone to replace Plaintiff.

This undisputed evidence establishes that, due to especially poor economic conditions in the Agronomy Division and the ease with which Plaintiff's tasks could be distributed among existing employees, Ag Valley would have eliminated Plaintiff's position as part of the RIF, whether or not Plaintiff had been in the midst of taking FMLA leave. Thus, Ag Valley cannot be held liable for interfering with Plaintiff's FMLA rights, and Plaintiff is not entitled to restoration of his job as a result of this interference. *Throneberry*, 403 F.3d at 977 ("[A]n employer who interferes with an employee's FMLA rights will not be liable if the employer can prove it would have made the same decision had the employee not exercised the employee's FMLA rights.").

### B. Retaliation Claim

An FMLA retaliation claim alleges that an employer discriminated against an employee for asserting his rights under the act. Basing an adverse employment action on an employee's use of FMLA leave is therefore actionable. To establish a retaliation claim, [the plaintiff] must show: (1) that [he] exercised rights afforded by the Act; (2) that [he] suffered an adverse employment action; and (3) that there was a causal connection between [his] exercise of rights and the adverse

employment action.

*Wisbey*, 612 F.3d at 676 (quotations, citations & alterations omitted).[2]  "The kind of causal connection required for a prima facie case is not 'but for' causation, but rather a showing that an employer's retaliatory motive played a part in the adverse employment action."  *Id.* (quotation omitted).

Because the plaintiff does not have direct evidence of retaliation in this case, his FMLA retaliation claim must be analyzed under the *McDonnell Douglas*[3] burden-shifting framework, which requires that after the plaintiff establishes a prima facie case, the burden shifts to the defendant "to come forward with evidence of a legitimate, nondiscriminatory reason for the adverse action.  Their burden is not onerous and the showing need not be made by a preponderance of the evidence." *Phillips v. Mathews*, 547 F.3d 905, 912 (8th Cir. 2008) (quotations omitted).  If the defendant does so, the plaintiff "must come forward with evidence that creates an issue of fact as to whether the asserted reason was pretext for discrimination," *id.*, by presenting evidence that (1) creates a question of fact as to whether the employer's proffered reason for the adverse employment action was pretextual and (2) creates a reasonable inference that the employer acted in retaliation.  *Smith v. Allen Health Systems, Inc.*, 302 F.3d 827, 833-34 (8th Cir. 2002).  For instance, an employee may establish pretext by:

> demonstrating that the employer's proffered reason has no basis in fact, that the employee received a favorable review shortly before he was terminated, that similarly situated employees who did not engage in the protected activity were treated more leniently, that the employer

---

[2]*See also* 29 U.S.C. § 2615(a)(2) ("It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.").

[3]*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-06 (1973).

16

changed its explanation for why it fired the employee, or that the
employer deviated from its policies.

*Phillips*, 547 F.3d at 913 (quotation omitted).

Plaintiff argues that the close temporal proximity between his taking of FMLA
leave and his termination (i.e., Plaintiff was terminated *during* his FMLA leave)
constitutes sufficient evidence of the causal connection needed to establish a prima
facie case of FMLA retaliation. (Filing 22, Pl.'s Br. Opp'n Mot. Summ. J. at
CM/ECF p. 19.) In such cases, the Eighth Circuit Court of Appeals has found that
"this is sufficient, but barely so, to establish causation, completing [the plaintiff's]
prima facie case." *Smith,* 302 F.3d at 833 (when plaintiff's family leave began on
January 1 and plaintiff was discharged on January 14, proximity was "sufficient, but
barely so, to establish causation"). Thus, I shall assume for purposes of Defendant's
motion for summary judgment that Plaintiff has established a prima facie case of
FMLA retaliation.

Defendant's stated reason[4] for terminating Plaintiff's employment is its
reduction in force caused by an economic slowdown, particularly in the dry-fertilizer
area. Plaintiff says this is pretext, arguing that it was *he*—not his *position*—that was

---

[4]During his deposition, Plaintiff repeatedly responded, "I have no idea" to
several questions posed by Defendant's counsel regarding Ag Valley's possible
motivation for Plaintiff's termination: "Do you think you were discharged for taking
FMLA leave?"; "Why do you think you were discharged?"; "Why do you think that
your position was one of the positions that Ag Valley chose to eliminate during the
reduction of force?"; "If you hadn't have been off work at that time, do you think you
would have been one of the people chosen to be terminated?"; and "Do you think
your being off work had any impact on the decision to terminate your position?"
(Filing 16-2, Bodfield Dep. 210:17-214:5.) This testimony certainly does not help
Plaintiff in his quest to establish a connection between his FMLA leave and his
termination.

17

actually eliminated, as evidenced by the facts that several other people who are still employed with Defendant perform Plaintiff's former duties and no other truck drivers were eliminated.  (Filing 22, Pl.'s Br. Opp'n Mot. Summ. J. at CM/ECF p. 22.)

Plaintiff has not presented any evidence that Ag Valley's asserted reason for eliminating Plaintiff's position pursuant to its RIF is implausible, not worthy of credence, or even suggests retaliation.  To the contrary, several facts cut against a finding of FMLA retaliation in this case.

First, Plaintiff took an extended period of time off work in June and July 2009 to be with his wife, who was suffering from terminal cancer.  While Plaintiff was off work, he exhausted all of his accrued paid sick leave and paid vacation leave.  At Plaintiff's request, Ag Valley provided Plaintiff with over 100 hours of pay for absolutely no work completed to ensure that Plaintiff was financially able to spend time with his wife during her final days.  In fact, Plaintiff testified that Hunter was "very compassionate" in the way he handled the situation with Plaintiff's wife, and Plaintiff testified that he was very grateful to Hunter for his generosity.

Second, Plaintiff acknowledges utilizing FMLA leave on multiple occasions in the past, either to care for his ailing wife or for his own periodic medical issues.  Plaintiff admits that Ag Valley never retaliated against him for taking FMLA leave, and his pay and benefits were always the same (or greater) when he returned to work.  Plaintiff also admits that nobody at Ag Valley made any negative comments to him about taking FMLA leave and, when asked directly what he believed to be the reason for his termination, Plaintiff declined to even speculate that his termination was related to his FMLA leave.

Finally, as opposed to singling Plaintiff out for termination, Ag Valley implemented several business-wide cost-cutting measures—not just a RIF at Plaintiff's location—as a result of a market downturn that was particularly hard on

18

Ag Valley's fertilizer business due to the abundance of high-priced fertilizer that Ag Valley was unable to sell due to decreased demand. This economic situation caused the Agronomy Division (of which Plaintiff was a part) to be significantly overstaffed as compared to Ag Valley's other divisions and caused a decrease in Plaintiff's workload such that he was spending less than 50% of his time delivering dry fertilizer. Further, Ag Valley determined that Plaintiff's dry-fertilizer truck-driving duties could easily be allocated among numerous existing employees with truck-driving capabilities without affecting Ag Valley's customer service.

Plaintiff has submitted no evidence whatsoever that contradicts Ag Valley's evidence establishing its history of generous financial support toward Plaintiff, its lack of retaliation for any of Plaintiff's past FMLA leave periods, and the company's declining financial situation, especially in the division in which Plaintiff was employed. Thus, there are no inconsistencies or contradictions in Ag Valley's proffered explanation for Plaintiff's termination, thereby preventing any reasonable fact-finder from finding pretext.

Due to Plaintiff's failure to present evidence that creates a genuine issue of material fact as to pretext and that creates a reasonable inference that Ag Valley acted in retaliation when it terminated Plaintiff's position, no reasonable jury could draw an inference that Plaintiff was singled out for termination because he took FMLA leave.

Accordingly,

IT IS ORDERED:

1.     Defendant's motion for summary judgment (filing 14) is granted;

2.     Judgment shall be entered by separate document.

19

DATED this 25ᵗʰ day of April, 2011.

BY THE COURT:

*Richard G. Kopf*

United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.